**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CITIZENS BANK, N.A.,<br><br>        Plaintiff,<br><br>        v.<br><br>GARDA CL ATLANTIC, INC.,<br><br>        Defendant. | Civil Action No. |

**COMPLAINT**

Plaintiff Citizens Bank, N.A. ("Citizens"), by and through its undersigned counsel, brings this action for declaratory judgment, injunctive relief, and other appropriate relief, and for its Complaint alleges, upon knowledge with respect to itself and its own acts and upon information and belief with respect to all other matters, as follows:

**PRELIMINARY STATEMENT**

Citizens brings this complaint because Defendant Garda CL Atlantic, Inc. ("Garda") has made clear its intention to suddenly stop providing services to Citizens on April 15, 2015. Garda's acts are in violation of contractual obligations and an effort to maliciously interrupt Citizens' regular access to the cash it needs to provide routine services to its customers in New England and in the Midwest. Chris Jamroz, Defendant Garda's President and Chief Operating Officer of Cash Services, has expressed Garda's intent to try to harm thousands of Citizens' customers by intentionally interrupting Citizens' operations unless Citizens pays an unsubstantiated monetary demand. Citizens has repeatedly asked Garda to disavow its intent and provide assurances of continued cash delivery services. Garda has refused. Thus, Garda's

intent to suspend these services is not only in gross violation of its plainly stated contractual obligations, but is calculated to harm thousands of individuals and small businesses who are Citizens' customers. Accordingly, Citizens requests assistance from this Court to prevent this egregious harm to the public interest.

For the past five years, Garda has provided Cash in Transit ("CIT") services that Citizens needs to reliably service its customers. Garda has transported cash, checks and coins among Citizens' network of bank branches, automated teller machines ("ATMs"), and secure cash vaults. As the parties' contract approaches its conclusion, the parties' written agreement is clear that Garda must "cooperate" with Citizens and continue to provide its services for an additional "one hundred and eighty (180) days after the effective date of [any] termination" in order to provide a smooth migration of services from Garda to Citizens' new CIT vendor. But Jamroz has said that Garda will breach this promise and immediately cease work on April 15, 2015—and "put [Citizens] to the ground" by "stop[ping] the [armored] trucks [from] going to [Citizens'] branches"—unless Citizens accedes to unsubstantiated multi-million dollar demands. According to Jamroz, "a lot of people" at Garda would be excited to suddenly stop serving Citizens because the Garda "Board cannot wait to teach a bank a lesson."

Citizens has not been idle in response to Garda's actions. The bank has diligently pursued and partially procured replacement services on an accelerated schedule. But potential replacement vendors, of which there are a few, cannot confirm a complete ability to assume immediately all the CIT services that Garda currently provides to Citizens. Citizens' customers deserve the reliable and uninterrupted banking services they have come to depend upon, but Citizens cannot guarantee that high level of service at hundreds of branches and ATMs if Garda suddenly walks away from its contractual promises. In addition, the steps Citizens has taken

to mitigate the effects of Garda's decision have imposed substantial costs and damages that Citizens is entitled to recoup fully from Garda.

Garda's excuse for its action is a late-arising claim that Citizens owes millions that accrued over the five years of the parties' contract. Garda asserts this is a breach that permits it to terminate the agreement, effective April 15, 2015.

But even if Garda is right about any debt owed by Citizens (and it is not), the parties' agreement requires Garda to continue providing services for "one hundred and eighty (180) days after the effective date of [any] termination" so that Citizens can smoothly migrate CIT services to a new vendor. This protection is critical to enable the undisrupted availability of funds to the bank's customers. In a worst-case scenario, a cascade of foreseeable events could result in customer transactions not being processed, regular bank services not being fully available, and individuals and businesses suffering unnecessary harm as a result of Garda's desertion.

Citizens has and will continue to protect its customers from Garda's wrongful actions. This lawsuit seeking the Court's assistance and appropriate relief in response to Garda's stated intentions is necessary to protect Citizens and its customers.

## **THE PARTIES**

1. Citizens Bank, N.A. is a national bank that provides consumer and commercial banking services through over 1,200 retail branch locations and 3,200 ATMs primarily located in New England, Mid-Atlantic, and Midwestern states and operating primarily under the brand name "Citizens Bank." Citizens' home office is in Providence, Rhode Island.

2. Defendant Garda CL Atlantic, Inc. is a Delaware corporation with its principal place of business in Palm Beach County, Florida. Since 2012, Garda has been owned by the private equity firm Apax Partners and by certain of Garda's executives. Garda provides various Cash in Transit services to financial institutions.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as there is complete diversity between the parties and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00) exclusive of interest, costs, and attorneys' fees.

4. Venue and personal jurisdiction are proper in the District of Massachusetts under 28 U.S.C. § 1391(b)(2), (3) because a substantial part of the events or omissions giving rise to the claim occurred in Massachusetts, and Defendant is otherwise subject to personal jurisdiction in Massachusetts. Garda has transacted business and contracted to supply services in Massachusetts, Garda has caused tortious injury by its acts and omissions in Massachusetts, and Citizen's claims arise from these activities. Mass. Gen. Laws ch. 223A, § 3(a)-(c).

## STATEMENT OF FACTS

**Cash in Transit Services**

5. As part of its regular banking operations, Citizens contracts with third-party vendors to provide what are known in the financial industry as "Cash in Transit" ("CIT") services.

6. As a general matter, CIT services for which Citizens contracts involve secure physical transfers of coins, banknotes, and other valuable items by armed guards in armored cars to and from hundreds of bank branches, ATMs, drop boxes, vaults, and other locations.

7. The regular and dependable performance of CIT services is essential for Citizens to provide uninterrupted banking services to its customers.

**Citizens' Contract with Garda**

8. Citizens and Garda entered into a contract effective November 9, 2009 (the Master Professional Services Agreement or "MPSA"), under which Garda agreed to perform CIT services. The MPSA provides that Garda shall provide services to Citizens as set forth in

-4-

Statements of Work, (MPSA § 3.1), and Citizens and Garda entered into just such a Statement of Work, with an effective date of November 1, 2010 (the "SOW"). The parties later entered into a First Amendment to Statement of Work (the "First Amendment"), dated as of January 9, 2012. Together, the MPSA, the SOW, and First Amendment form the "Agreement." The Agreement is scheduled to expire at the end of 2015. (SOW § 1.)

9.  The Agreement requires Garda to provide three main categories of CIT services to Citizens. First, Garda delivers to and receives from Citizens' branches cash to allow those branches to cash checks, to provide change, and to meet demands for cash withdrawals from accounts.

10. This money supply is also used to fill orders for cash from Citizens' small- and medium-size business customers who use Citizens' retail branches to supply the currency they use in their businesses.

11. Second, Garda regularly services Citizens' remote ATMs by replenishing machines with cash and removing deposited checks, cash, and captured bank cards (*i.e.*, bank cards held in the ATM in cases of potential fraud) for processing at Citizens' vaults and branches. Third, Garda collects deposits from large commercial customers from night-drop boxes throughout New England and transports them for same-day processing.

**The Planned Migration of Services from Garda to Other CIT Services Vendors**

12. In April 2014, with the Garda contract's term nearing its final year before expiration, Citizens commenced a customary request for proposal process through which it solicited and received proposals from potential vendors of CIT services, including Garda.

13. Before Citizens could announce its choice of a new CIT service vendor, Garda informed Citizens on October 8, 2014 that it wanted to cease all contractual relations with Citizens.

14. Thereafter, on October 9, 2014, Citizens announced its decision to award contracts for CIT services to a vendor other than Garda.

15. Following Citizens' decision regarding a new CIT service provider, Citizens and Garda began planning an orderly migration of CIT services from Garda to the new vendor, as is contemplated by the Agreement and customary in the industry.

16. As is typical in the CIT services industry, the Agreement requires Garda to continue providing services to Citizens for an extended period after any contract termination so that disruptions resulting from the transition are minimized. Specifically, the Agreement provides that Garda is required to continue providing services and to "cooperate with and assist Citizens in effecting the orderly transfer of [CIT] Services to a third party," even if the Agreement is terminated, for an additional "one hundred and eighty (180) days after the effective date of the termination." (MPSA §§ 3.1, 10.5; SOW § 11.3.)

17. From October 2014 to February 2015, Citizens, Garda, and Citizens' new CIT services vendor met to discuss and agree on a detailed transition plan and timetable for the migration of CIT services from Garda to the new CIT services vendor.

18. The transition plan that has been the subject of the parties' discussions, in its most recent versions, calls for Garda to continue providing services to Citizens while activities are transitioned to a new vendor between April 6, 2015 and late June 2015.

19. With respect to the transition of CIT services for the hundreds of Citizens' retail branches and night-drop boxes that Garda services, Garda is expected to continue servicing each location until the date on which the new CIT vendor will assume responsibility for the CIT services at those locations.

20. The transition of CIT services for the hundreds of remote ATM locations that Garda services for Citizens is more complex. Garda and Citizens' new CIT services vendor

are scheduled to meet at those ATM machines at dates and times to be established with pre-ordered lock equipment unique to each machine. The locks are then changed, information and security instruments are exchanged, the cash in the machine is removed by Garda, and the machine is then replenished with new cash by the new CIT services vendor.

21. Dates were set for the transition of more than 400 ATMs throughout New England starting on April 6, 2015, and a number of those ATMs have already been transitioned.

22. Garda and Citizens have also participated in weekly meetings to coordinate a smooth migration of services from Garda to the new CIT services providers. Precise coordination between Garda, Citizens, and the new vendor—as well as Garda's cooperation—is necessary for the CIT services to be transitioned without interruption.

**Garda's Plan to Cease Providing Vital CIT Services On April 15, 2015;**
**Garda's Obligation to Continue Providing CIT Services Until at Least October 12, 2015**

23. Despite more than five years of a business relationship in which work was performed and invoices were routinely settled, Garda for the first time in February and March 2015 complained that Citizens had misapplied certain credits under the Agreement.

24. On March 16, 2015, Garda sent a letter dated March 15, 2015 to Citizens complaining about the manner in which Citizens had accounted for those certain credits under the Agreement, and asserting that Citizens' allegedly improper accounting constituted a breach of contract that entitled Garda to terminate the contract with an effective date of April 15, 2015, thirty days after the purported termination notice.

25. In its March 15, 2015 letter, Garda demanded payment of over $4 million, despite never invoking the contractually mandated dispute resolution procedures in the Agreement, and despite providing no documentation or other substantiation for its claims.

26. While Citizens contests Garda's accounting claims and disputes Garda's right to declare any termination of the Agreement, the merits of those disputes are irrelevant to this action. Even if Garda's purported termination of the contract is valid (and it is not) Garda is required to provide CIT services to ensure the orderly transition of those services from Garda to the new CIT services vendor. The Agreement expressly provides for continuing services beyond the effective termination date of the contract, thus allowing Citizens' banking services to continue to function without interruption and ensuring that Citizens customers and other members of the public have uninterrupted access to banking services and facilities.

27. Specifically, the Agreement requires that "[i]n the event of termination," Garda "shall cooperate with and assist Citizens in effecting the orderly transfer of Services to a third party," and that "[s]uch Services shall be provided to Citizens for up to one hundred and eighty (180) days after the effective date of the termination of this Agreement." (MPSA § 10.5; *accord* SOW § 11.3.)

28. Thus, even accepting Garda's own position on the supposed accounting dispute and its alleged right to declare a termination of the Agreement, Garda must continue to provide CIT services to Citizens at least until October 12, 2015.

29. The existence of a supposed dispute over the accounting of credits under the Agreement does not in any way diminish Garda's contractual obligation to continue providing services beyond any effective termination date.

30. There is no provision in the Agreement that entitles Garda to unilaterally stop work in response to a contract dispute.

31. The Agreement provides that Garda will be paid for work it performs under the Agreement, including work performed during the 180 days after the effective date of the termination of the Agreement.

32. Despite its clear contractual obligation to continue providing CIT services beyond any date on which a termination of the Agreement is effective, Garda has repeatedly expressed its intent to cease providing on April 15, 2015 any services whatsoever under the Agreement unless Citizens acquiesces to Garda's unsubstantiated demands for multi-million dollar payments.

33. On April 1, Citizens wrote to Garda requesting assurances that Garda will continue to perform its obligations under the Agreement, but Garda did not respond. This was repeated in person on April 2 and in a written correspondence from Citizens' outside counsel, Jones Day, on and after April 3, 2015. Garda has refused to provide Citizens with assurances that it will continue to provide CIT services after April 15, 2015.

34. Indeed, Garda has made clear its intent to jeopardize Citizens' customers by claiming it will cease all work on April 15, 2015.

35. Garda's plan to cease all work on April 15, 2015, despite its contractual obligations, unless Citizens accedes to its demands for a multi-million dollar payment is plainly being done in an attempt to extort a payment.

36. Given Citizens' desire to act in good faith and reach a resolution, Citizens agreed to attend a March 30 meeting with Garda meant to clarify the parties' positions and see if a meeting of the minds could be reached. In that meeting, Chris Jamroz, Garda's President and Chief Operating Officer of Cash Services, threatened Citizens in words to the effect of, "if you think it is bad when one or two branches has no money, think about what it would be like across the whole system."

37. On April 8, 2015, Jamroz again explicitly stated that if Citizens did not make a deal, "not a single truck [will go] out on April 15"—explaining that Garda's "Board cannot wait to teach [Citizens] a lesson." Jamroz said that Garda fully intends to "put [Citizens] to the ground [and] . . . stop [the] trucks [from] going to [Citizens'] branches."

-9-

38. Jamroz has even bragged that Garda had extracted exorbitant transition fees from another bank in an earlier circumstance when a bank was forced to give in to Garda's demands because of its reliance on Garda's vital CIT services.

39. In response to Garda's stated intention to stop performing work under the Agreement, Citizens has diligently worked to secure replacement service on an accelerated schedule. But despite Citizens' best efforts, potential replacement vendors have confirmed that they will not be able to fully assume the current CIT services schedule that Garda now provides. Citizens' efforts in this respect are ongoing.

## COUNT I: DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

40. Citizens repeats and realleges each and every prior allegation in this Complaint as if it were fully set forth herein.

41. A valid and binding contract, the Agreement, exists between Citizens and Garda, made for valid consideration, obligating Garda to perform CIT services.

42. Citizens has performed its duties under the contract.

43. The Agreement requires that, upon any termination, Garda is obligated to "cooperate with and assist Citizens in effecting the orderly transfer of Services to a third party," and that "[s]uch Services shall be provided to Citizens for up to one hundred and eighty (180) days after the effective date of the termination of this Agreement." (MPSA § 10.5; *accord* SOW § 11.3.)

44. Garda has repeatedly stated its intention to cease providing all CIT services to Citizens on April 15, 2015, despite its contractual obligation to do so for at least another 180 days.

45. If Garda prematurely stops providing CIT services on April 15, 2015, Citizens' banking services will be disrupted and Citizens and its customers will be substantially harmed.

-10-

The harms will be irreparable and will include harms to Citizens' business, reputation, and customer good will.

46. Under the Agreement, Garda has no right to refuse to "cooperate with and assist Citizens in effecting the orderly transfer of Services to a third party" in the 180-day period after a termination. Whether Garda's March 15, 2015 notice of a termination effective April 15, 2015 is considered valid, Garda is obligated to continue performance for 180 days after a purported termination date of April 15, 2015.

47. An actual dispute exists between Citizens and Garda about Garda's obligations under the Agreement.

48. This is a substantial controversy between Citizens and Garda, who have adverse legal interests.

49. A declaration of Garda's obligations under the Agreements is necessary to protect Citizens and its business.

### COUNT II: VIOLATION OF MASSACHUSETTS GENERAL LAWS CHAPTER 93A, SECTION 11

50. Citizens repeats and realleges each and every prior allegation in this Complaint as if it were fully set forth herein.

51. Garda's plan—to breach its Agreement with Citizens and cause irreparable harm to Citizens and its customers—constitutes unfair and deceptive trade practices in violation of Massachusetts General Laws Chapter 93A, § 11.

52. In short, Garda's ultimatum constitutes commercial extortion.

53. Citizens has many branches and ATMs in Massachusetts, and the harms from Garda's conduct will be substantially incurred in Massachusetts.

54.     Whatever the merits may be of Garda's claims regarding the application of certain credits under the Agreement, Garda may not intentionally breach the Agreement to achieve a result based not on the merits, but upon its ability to inflict harm on Citizens' customers and the bank itself.

55.     Garda's behavior and threats have caused Citizens to spend additional time and effort to attempt to try to ameliorate the irreparable harm Garda may cause, at substantial cost. The steps Citizens has taken and will continue to take in order to mitigate the effects of Garda's decision have imposed substantial costs and damages that Citizens is entitled to recoup in full. Those amounts are already well in excess of $75,000, and the final amounts will be proven at trial.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests this Court issue:

(1)     a Declaratory Judgment that Garda is required to perform under the Agreement, including, without limitation, under Section 10.5 of the MPSA and 11.3 of the SOW;

(2)     a judgment in its favor on all Counts of this Complaint;

(3)     a temporary restraining order and preliminary injunction, as well as a permanent injunction, requiring Garda to provide its contractually obligated CIT services;

(4)     an award to Citizens for the damages resulting from Garda's unfair and deceptive trade practices including punitive damages and attorneys' fees;

(5)     an order granting Citizens such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Citizens hereby demands a jury trial on all claims so triable.

Respectfully submitted,

CITIZENS BANK, N.A.
by its attorneys,

/s/ Michael T. Marcucci

Dated: April 13, 2015

Michael T. Marcucci (BBO# 652186)
JONES DAY
100 High Street
Boston, MA 02110
(617)960-3939
mmarcucci@jonesday.com


Lee A. Armstrong (*pro hac vice to be filed*)
Thomas E. Lynch (*pro hac vice to be filed*)
JONES DAY
222 East 41st Street
New York, New York 10017-6702
(212) 326-3939
laarmstrong@jonesday.com
telynch@jonesday.com

Of Counsel


*Attorneys for Plaintiff Citizens Bank, N.A.*